

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40196-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AUSTIN CECIL ERICKSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — A jury found Austin Erickson guilty of the crime of attempting to elude a pursuing police vehicle. The jury further found the aggravating circumstance that Mr. Erickson endangered one or more persons, other than himself or the pursuing officer, while committing the crime. The court imposed a standard range sentence plus a year and a day for the aggravating circumstance, totaling 15 months. The court further ordered Mr. Erickson to pay a $500 fine.

Mr. Erickson appeals, arguing: (1) there was insufficient evidence to convict him of attempting to elude and to support the aggravating circumstance; (2) the court's instructions to the jury were misleading and did not properly inform the jury of the applicable law; (3) the court erroneously allowed prejudicial testimony that he was "wanted;" (4) his right to a jury trial was violated at sentencing; (5) the court erred by not conducting a comparability analysis for his out-of-state convictions; and (6) the $500 fine was erroneously imposed. We disagree with each of his arguments and affirm.

BACKGROUND

On the evening of September 26, 2023, Mr. Erickson's brother, Rylan Erickson, and his father, Scott Erickson,[1] were at "a family property" when they saw Mr. Erickson driving his vehicle, a Chevrolet Malibu, and "attempting to enter the property." Rep. of Proc. (RP) at 206-07. After spotting Mr. Erickson, Rylan called a nonemergency dispatch line to report a "wanted fugitive." RP at 213. Rylan and Scott followed Mr. Erickson's vehicle while on the telephone with dispatch and relayed Mr. Erickson's name, location, and license plate information.

Deputy Nathan Conley received the call from dispatch regarding Mr. Erickson. Deputy Conley "[ran] an inquiry" using Mr. Erickson's name and date of birth and

---

[1] Scott Erickson's full name is Brian Scott Erickson, but he prefers to go by "Scott." RP at 172. Rylan Erickson is referred to by his first name and Brian Scott Erickson is referred to as Scott for clarity. No disrespect is intended.

confirmed Mr. Erickson was "wanted." RP at 135. The deputy observed Mr. Erickson's

vehicle on 13th Street and almost immediately saw Mr. Erickson "cross[] over the lane

of travel without signaling and fail[] to signal as [he] went west onto Elm Street" at a

"high rate of speed." RP at 136. Deputy Conley activated his emergency lights and

sirens but quickly terminated pursuit when it became "obvious" Mr. Erickson was not

going to stop. RP at 141. Deputy Conley canvassed the area for Mr. Erickson and his

vehicle. The Chevrolet Malibu was later located.

Mr. Erickson was subsequently arrested and charged with attempting to elude a

pursuing police vehicle with a special allegation that "one or more persons other than the

Defendant or the pursuing law enforcement officer were threatened with physical injury

or harm by the actions of the person committing the crime of attempting to elude a police

vehicle" (hereinafter "endangerment enhancement"). Clerk's Papers (CP) at 1. The case

proceeded to a jury trial.

The State filed a "Motion to Include Specific Evidence and Testimony" requesting

that it be permitted to "introduce testimony or evidence regarding any warrants for

[Mr. Erickson's] arrest that were active on September 26, 2023" prior to trial. CP at 6.

The State argued Mr. Erickson had two active warrants, and the "existence of these

warrants provide[d Mr. Erickson] with a motive to flee from Deputy Conley" and were

"circumstantial evidence" that Mr. Erickson knew Deputy Conley intended to pull him

over. CP at 6. The State contended the probative value of the evidence outweighed any

3

prejudicial effect because it would provide the jury "with an insight into" Mr. Erickson's

"*mens rea* that they would not otherwise have." CP at 7. The State further claimed that

"any prejudice that may result to [Mr. Erickson] from the implication that he had

previously been involved in criminal activity may be prevented by providing the jury

with an instruction limiting the purposes for which they may consider the evidence." RP

at 7. The State also offered to instruct its witnesses "not to discuss the nature of the

underlying crimes." CP at 7. Mr. Erickson opposed the motion.

The court granted the State's motion and permitted it "to offer testimony or any

other form of evidence that [Mr. Erickson] had active warrants for his arrest" but ordered

the State "to refrain from offering testimony or any other form of evidence concerning

the nature of the underlying crimes." CP at 8. At a pretrial hearing, the court reiterated

that "the officers can say that they ran the plates, his name, and knew he had a warrant,

but not what crime you had outstanding because I feel that's overly prejudicial and I

don't want that to happen." RP at 19. The court never provided the jury with a limiting

instruction.

At trial, Rylan, Scott, and Deputy Conley testified for the State. Mr. Erickson

testified in his own defense.

Rylan testified consistent with the above. He also testified that Mr. Erickson was

in the driver's seat of the Chevrolet Malibu when he first spotted him. During Rylan's

testimony, the State moved to admit a recording of the call to law enforcement. The call

4

was admitted as exhibit P-3 and played for the jury. Rylan is heard telling dispatch he "would like to report a wanted fugitive." RP at 213. Rylan is also heard telling the operator that "[Mr. Erickson is] speeding up, trying to get out. He just took a left onto Elm." RP at 219. Rylan testified that Mr. Erickson "took off like a bat out of hell." RP at 210. Rylan and Scott both testified they had been informed that Mr. Erickson "was in some sort of trouble" and to call law enforcement if they saw him. RP at 178.

Deputy Conley testified he received a call from dispatch regarding a "wanted person." RP at 132. When he reached 13th Street, he saw Rylan and Scott in a white truck and located Mr. Erickson's vehicle. He then confirmed "that the name that had been mentioned was actually wanted, so I'm not just chasing or going after somebody trying to catch up with somebody for nothing." RP at 134. Deputy Conley executed a "two or three-point turn," caught up to Rylan and Scott, and requested that dispatch tell them to pull off so he "could try to effect a traffic stop." RP at 135. The deputy testified:

> As soon as I turn around, I did see the truck following [Mr. Erickson] and almost immediately [Mr. Erickson] crossed over the lane of travel without signaling and failed to signal as [he] went west onto Elm Street, into the 1300 block. And it was at a high rate of speed. The way I would describe it, it was an exhibition of speed—accelerating quickly.

CP at 136. He estimated Mr. Erickson was traveling "at least 100 mph." CP at 137. He activated his "emergency overhead lights and audible sirens" but quickly deactivated them because "it was obvious to me that the vehicle—the driver—was not going to—or

5

wasn't making any attempt to yield or stop to my emergency lighting or audible sirens and wasn't going to, given the manner in which he was driving." RP at 141.

Deputy Conley testified that Elm Street is "a two-lane residential roadway, one lane in either direction" lined mostly with "houses" and "a few commercial businesses and a church." RP at 138. He stated Mr. Erickson "made no effort—sign of—indication of braking or slowing before just blowing straight through the stop sign" on 15th Street. RP at 140.

During Deputy Conley's testimony, the State moved to admit a video recording of the incident taken from the dash camera of Deputy Conley's vehicle. The 1 minute and 13 second video was admitted as exhibit P-1 and played for the jury. The recording appears to have been taken at dusk. Deputy Conley activated his emergency lights and siren 33 seconds into the video, and they remained on for approximately 8 seconds.

In the recording, Mr. Erickson's vehicle can be seen in the distance rapidly speeding away from Deputy Conley and running a stop sign. Moreover, just before Deputy Conley activated his lights and siren, a white truck appeared to back out of a driveway onto Elm Street before quickly retreating into the driveway on the activation of Deputy Conley's lights and siren. As the white truck moves from the roadway, the fleeing vehicle is seen rapidly passing by a vehicle headed in the opposite direction while the deputy's emergency equipment is activated.

6

Deputy Conley testified the white pickup truck in the dash camera video "had backed out of a driveway on the north side of the street and it was dead center in the street," and "that's where [Mr. Erickson] passed in front of his vehicle." RP at 139. He stated, "as I approached with my emergency lights and sirens, that vehicle decided it probably wasn't a good time to be on the roadway and just pulled back into the driveway." RP at 139. Finally, Deputy Conley testified Mr. Erickson's vehicle had a "police scanner" that was "wired in" and "powered." RP at 155. He testified the scanner scans "police frequencies" and could allow someone to listen in on a call to dispatch. RP at 156.

Mr. Erickson testified he was not the one driving the Chevrolet Malibu during the incident and that he frequently let others drive the vehicle, which was registered to his girlfriend. Though he denied being the driver, he admitted that the dash camera recording demonstrated the vehicle was signaled to stop.

Following testimony, the court instructed the jury. The State presented argument during summation to support the aggravating circumstance. The State argued Mr. Erickson endangered the driver of the white pickup truck "trying to back out of their driveway," claiming Mr. Erickson almost hit the white pickup truck "at 100 mph." RP at 295, 307. The State further argued:

> The [aggravating circumstance] Instruction also doesn't require that there's
> pedestrians out. It can be another vehicle; another motorist, like the person
> backing out of their driveway. Like any of those other people—you can see
> the headlights coming in that the Defendant passes at 100 mph.

7

RP at 307. Defense counsel primarily argued that Mr. Erickson was not the driver of the vehicle.

The jury found Mr. Erickson guilty of attempting to elude a pursuing police vehicle and made a special finding that he endangered one or more persons, other than himself or the pursuing officer, during the commission of the crime. Mr. Erickson was sentenced pursuant to a stipulated offender score that included two convictions from Idaho. The stipulated "Statement of Defendant's Criminal History" referenced RCW 9.94A.525 and stated, "[t]he parties acknowledge and agree that the above information accurately reflects the Defendant's comparable felony history to the best of the parties' knowledge and belief." CP at 32. Mr. Erickson was found to be indigent, and a $500 fine was imposed under RCW 9A.20.021.

Mr. Erickson timely appeals.

## ANALYSIS

### SUFFICIENCY OF EVIDENCE

Mr. Erickson argues there was insufficient evidence to convict him of attempting to elude a pursuing police vehicle. He also contends there was insufficient evidence to support the aggravating circumstance. We disagree.

The sufficiency of the evidence is a question of law this court reviews de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). In a sufficiency of the evidence challenge, "we review the evidence in the light most favorable to the State to determine

8

'whether . . . any rational trier of fact could have found guilt beyond a reasonable doubt.'" *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn from it." *State v. DeVries*, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). We can infer criminal intent from the defendant's conduct, and circumstantial evidence and direct evidence carry equal weight. *Varga*, 151 Wn.2d at 201. However, "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

The due process clause of the Fourteenth Amendment to the United States Constitution requires that the State prove every element of an alleged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). If the State fails to present sufficient evidence at trial to support the elements of the crime, double jeopardy prohibits a retrial. *Burks v. United States*, 437 U.S. 1, 11, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). The double jeopardy clause of the Fifth Amendment does not afford the State a second opportunity to supply evidence in a second trial that it failed to muster in the first. *Id*.

Mr. Erickson argues there was insufficient evidence to convict him of attempting to elude because the short time between the activation and deactivation of Deputy Conley's lights and siren does not support the conclusion that Deputy Conley actually

9

attempted to stop him. Moreover, he contends the dash camera recording does not show him driving recklessly in a manner that endangered others, and there is therefore insufficient evidence to support an aggravating circumstance.

*Attempting to Elude*

To be convicted of attempting to elude, "'a suspect must (1) willfully fail (2) to immediately bring his vehicle to a stop, (3) and drive in a manner indicating a wanton and willful disregard for the lives or property of others (4) while attempting to elude police after being signaled to stop by a uniformed officer.'" *State v. Tandecki*, 153 Wn.2d 842, 848, 109 P.3d 398 (2005) (emphasis omitted) (quoting *State v. Sherman*, 98 Wn.2d 53, 57, 653 P.2d 612 (1982)); *see also* RCW 46.61.024(1).

Mr. Erickson argues the brevity of time Deputy Conley had his emergency equipment activated in attempting to stop the vehicle is insufficient to support a conviction for attempting to elude. In particular, he contends Deputy Conley's testimony does not correspond to the dash camera recording and that a review of the recording reveals that the attempt to stop Mr. Erickson lasted no longer than 10 seconds.

At trial, Deputy Conley testified about his attempt to stop Mr. Erickson. In particular, the deputy testified that he "observed [Mr. Erickson's] vehicle at the high rate of speed" when he turned onto Elm Street, and that is when he "activated [his] emergency overhead lights and audible sirens." RP at 138. Deputy Conley also testified that, on review of the recording, he noticed a white pickup truck "had backed out of a driveway

10

on the north side of the street" but the truck pulled off the road as he approached with his emergency lights and sirens activated. RP at 139. Deputy Conley testified that due to Mr. Erickson's high rate of speed, his failure to stop at a stop sign, and the residential nature of the area, he deactivated his lights and siren and terminated the pursuit.

Additionally, the 1 minute and 13 second dash camera recording from the attempted stop was played for the jury. Deputy Conley appears to activate his emergency lights and siren 33 seconds into the video, and they remain on for approximately 8 seconds. The recording shows Mr. Erickson's vehicle in the distance rapidly speeding away from Deputy Conley and failing to stop at a stop sign. Moreover, a white truck appears to be backing out of a driveway onto Elm Street just before Deputy Conley activated his lights and siren, and it is seen quickly pulling off the road and back into the driveway when Deputy Conley activated his emergency lights and siren.

Deputy Conley's testimony along with the dash camera recording were sufficient to convict Mr. Erickson of attempting to elude. First, Deputy Conley's testimony is not inconsistent with the dash camera recording. Second, the brevity of Deputy Conley's pursuit does not render the evidence insufficient to convict. Even though Deputy Conley's lights and siren were only activated for a short duration, it was clear in that time frame that Mr. Erickson was not going to stop and that continued pursuit could be dangerous given the residential nature of the area. Deputy Conley's decision to quickly terminate pursuit does not equate to a lack of an attempt to stop Mr. Erickson. Third,

11

Mr. Erickson admitted at trial that the Chevrolet Malibu was signaled to stop based on the dash camera recording.

Mr. Erickson also argues the white pickup truck's presence between his vehicle and the deputy's vehicle while the lights and siren were activated "does not support the conclusion" that Deputy Conley attempted to stop him. Br. of the Appellant at 21. This argument is unavailing. A jury could infer that Mr. Erickson's decision to speed away from Deputy Conley once his lights and siren were activated was indicative of Mr. Erickson's awareness that the deputy was attempting to stop him. In other words, Mr. Erickson's behavior was inconsistent with his contention that the white truck's presence between the two vehicles meant he was unaware Deputy Conley was trying to stop him.

The State presented sufficient evidence to convict Mr. Erickson of attempting to elude.

### *Endangerment Enhancement*

In regard to the aggravating circumstance finding, RCW 9.94A.834 states:

(1) The prosecuting attorney may file a special allegation of endangerment by eluding in every criminal case involving a charge of attempting to elude a police vehicle under RCW 46.61.024, when sufficient admissible evidence exists, to show that one or more persons other than the defendant or the pursuing law enforcement officer were threatened with physical injury or harm by the actions of the person committing the crime of attempting to elude a police vehicle.

12

If the fact finder finds beyond a reasonable doubt the defendant "committed the crime [of eluding] while endangering one or more persons other than the defendant or the pursuing officer," an increased punishment of an "additional twelve months and one day" is required to be added to the defendant's sentence. RCW 9.94A.834(2); RCW 9.94A.533(11).

Mr. Erickson argues the dash camera recording is insufficient to prove the aggravating circumstance. Moreover, he argues the State based the aggravating circumstance on his alleged endangerment of the person driving the white pickup truck, yet the evidence does not show they were ever threatened with physical injury or harm during the pursuit.

Here, Deputy Conley testified he observed Mr. Erickson's vehicle driving at a "high rate of speed" on Elm Street. RP at 138. He estimated Mr. Erickson was traveling "at least 100 mph." CP at 137. He noted that the white pickup truck was "safely backing to proceed onto the roadway," and Mr. Erickson had "passed the front of his vehicle." RP at 139. Moreover, he testified Elm Street is a "two-lane residential roadway" lined mostly with "houses" and a "few commercial businesses and a church." RP at 138. Deputy Conley also testified Mr. Erickson "bl[ew] straight through the stop sign" at Elm Street and 15th Street. RP at 140. Furthermore, during the 911 call, admitted at trial, Rylan is heard telling the operator that "[Mr. Erickson is] speeding up, trying to get out. He just took a left onto Elm." RP at 219. Rylan testified Mr. Erickson "took off like a

bat out of hell." RP at 210. During closing, the State argued Mr. Erickson endangered the driver of the white pickup truck as well as "any of those other people—you can see the headlights coming in that [Mr. Erickson] passes at 100 mph." RP at 307.

The State's evidence was sufficient to prove Mr. Erickson endangered one or more persons other than himself or Deputy Conley. The dash camera recording, along with Deputy Conley's testimony and the 911 call, demonstrated that, at minimum, Mr. Erickson endangered the occupants of the oncoming vehicle he passed by at approximately 100 miles per hour while the deputy's lights and siren were activated.

The evidence was sufficient for a jury to find Mr. Erickson endangered one or more persons other than himself or Deputy Conley while eluding.

INSTRUCTIONS TO THE JURY

Mr. Erickson contends the jury was not properly instructed because the court's instructions were misleading and did not inform the jury of the applicable law. Specifically, Mr. Erickson takes issue with instructions 10 and 12. The State responds that this issue is raised for the first time on appeal, and we should decline to address it. Further, the State argues Mr. Erickson's arguments fail on the merits. We decline to address Mr. Erickson's challenge to the jury instructions because they are raised for the first time on appeal.

Under RAP 2.5(a), this court may "refuse to review any claim of error which was not raised in the trial court." However, a party may raise a manifest error affecting a

14

constitutional right for the first time on appeal. RAP 2.5(a)(3). For us to accept review under RAP 2.5(a)(3), Mr. Erickson must demonstrate that the error is manifest and that the error is truly of constitutional dimension. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). For an error to be manifest, it must have resulted in actual prejudice. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). Actual prejudice means the error must have had practical and identifiable consequences in the trial of the case. *Id*. "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *Id.* at 100. An error is not manifest if the trial court could not have foreseen the potential error. *Id.*

Our Supreme Court has previously held that an error with a jury instruction *may* be raised for the first time on appeal if it is a manifest error affecting a constitutional right. *State v. Salas*, 127 Wn.2d 173, 182, 897 P.2d 1246 (1995). Moreover, our Supreme Court has found that omission of an element from a to-convict instruction is of sufficient constitutional magnitude to warrant review. *State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). This is because "[i]t cannot be said that a defendant has had a fair trial if the jury must guess at the meaning of an essential element of a crime or if the jury might assume that an essential element need not be proved." *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997). Nevertheless, "[i]nstructional error is not automatically constitutional error." *State v. Guzman Nunez*, 160 Wn. App. 150, 159, 248 P.3d 103

15

(2011), *aff'd in part*, 174 Wn.2d 707, 285 P.3d 21 (2012). This court has previously held a court's failure to instruct the jury that it could acquit a defendant nonunanimously is "not an error of constitutional dimension." *Id.*

Here, Mr. Erickson did not object to the court providing instructions 10 or 12 to the jury. Though Mr. Erickson filed a reply brief, he does not respond to the State's contention that his instructional challenge is unpreserved. Mr. Erickson fails to engage with RAP 2.5 or otherwise explain why this is an error of constitutional magnitude. Indeed, Mr. Erickson's challenge to instruction 12 is based on the court's failure to instruct the jury that it could acquit him nonunanimously, which is not a manifest error affecting a constitutional right. Similarly, Mr. Erickson does not explain how his challenge to instruction 10 implicates a constitutional right.[2] Thus, we decline to address Mr. Erickson's unpreserved challenge to the jury instructions.

ADMISSION OF PREJUDICIAL EVIDENCE

Mr. Erickson argues the trial court erred when it permitted the State to introduce evidence of his outstanding warrants. The State argues the evidence was properly admitted. We agree with the State.

---

[2] An instructional error that shifts the burden of proof from the State to the defendant is a manifest error affecting a constitutional right because the defendant's due process right to a fair trial is violated. *O'Hara*, 167 Wn.2d at 100. Mr. Erickson argues instruction 10, coupled with the special verdict form, relieved the State of its burden but he does not engage with RAP 2.5 or argue why it is a manifest error affecting a constitutional right.

Trial courts are afforded considerable discretion when it comes to considering the relevancy of evidence and balancing "the probative value of the evidence against its possible prejudicial impact." *State v. Rice*, 48 Wn. App. 7, 11, 737 P.2d 726 (1987). Therefore, we review a trial court's decision on relevance and prejudicial effect for a manifest abuse of discretion. *State v. Barry*, 184 Wn. App. 790, 801-02, 339 P.3d 200 (2014). A judge abuses their discretion when their decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Id.* at 802.

"Relevancy and admissibility of relevant evidence are governed by ER 401 and ER 402." *Rice*, 48 Wn. App. at 11. Relevant evidence has probative value, meaning it has a tendency to prove or disprove a material fact. ER 401; *Rice*, 48 Wn. App. at 12. Relevant evidence is generally admissible while irrelevant evidence is generally inadmissible. ER 402. Moreover, ER 403 provides that relevant evidence can "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." A danger of unfair prejudice exists "'[w]hen evidence is likely to stimulate an emotional response rather than a rational decision.'" *State v. Beadle*, 173 Wn.2d 97, 120, 265 P.3d 863 (2011) (quoting *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995)).

Further, ER 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

17

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Before evidence may be admitted under ER 404(b), the trial court must: "(1) find by a preponderance of the evidence that the misconduct [or crime] occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value of the evidence against [its] prejudicial effect." *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

The trial court must conduct the above analysis on the record. *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007). However, if the record shows the trial court adopted one of the parties' express arguments as to the purpose of the evidence and that party's weighing of the probative and prejudicial value, then the trial court's failure to conduct a full analysis on the record is not reversible error. *State v. Pirtle*, 127 Wn.2d 628, 650-51, 904 P.2d 245 (1995).

Mr. Erickson argues testimony about his active warrants was erroneous because the evidence was unduly prejudicial. The State responds that admission of that testimony was proper because it was relevant to establishing Mr. Erickson's motive for fleeing.

Prior to trial, the State filed a motion to include evidence about Mr. Erickson's warrant status on the day he attempted to elude law enforcement. The State argued Mr. Erickson had two active warrants, and the "existence of these warrants provide[d Mr. Erickson] with a motive to flee from Deputy Conley" and were "circumstantial evidence"

that Mr. Erickson knew Deputy Conley intended to pull him over.  CP at 6.  The State

also requested a limiting instruction and stated it would instruct its witnesses "not to

discuss the nature of the underlying crimes."  CP at 7.  Mr. Erickson opposed the motion.

The court granted the State's motion and permitted it "to offer testimony or any

other form of evidence that [Mr. Erickson] had active warrants for his arrest" but ordered

the State "to refrain from offering testimony or any other form of evidence concerning

the nature of the underlying crimes."  CP at 8.  At a pretrial hearing, the court reiterated

that "the officers can say that they ran the plates, his name, and knew he had a warrant,

but not what crime you had outstanding because I feel that's overly prejudicial and I

don't want that to happen."  RP at 19.

During opening statements, the State told the jury that Scott and Rylan informed

law enforcement that Mr. Erickson "had warrants for his arrest."  RP at 118.  At trial,

Deputy Conley testified a 911 call was received about a "wanted person's location" and

that he then "confirmed that the name that had been mentioned was actually wanted, so

I'm not just chasing or going after somebody trying to catch up to somebody for

nothing."  RP at 130, 134.  Deputy Conley stated he ran "an inquiry" with Mr. Erickson's

"name, date of birth and it showed that he was wanted."  RP at 135.  Additionally, Scott

testified that he had been informed that Mr. Erickson "was in some sort of trouble" and to

call law enforcement if he saw him.  RP at 178.  Rylan testified similarly.  During

closing, the State argued Mr. Erickson attempted to elude police because he knew "he

19

was going to be arrested." RP at 293. There was no testimony about the crimes

underlying the warrants.

Mr. Erickson argues the court erred in allowing these references to his outstanding

warrants. As to the first inquiry of the four-part test, he argues the court never confirmed

whether he had active warrants at the time of the incident. However, the

court only needed to find by a preponderance of the evidence that Mr. Erickson had

outstanding warrants when he attempted to elude. Here, defense counsel never quibbled

over whether Mr. Erickson had outstanding warrants. Additionally, Deputy Conley

testified he confirmed that Mr. Erickson was wanted. Based on the evidence and

arguments before it, the court could find by a preponderance of the evidence that Mr.

Erickson had warrants when he attempted to elude police.

As to the second inquiry, Mr. Erickson argues the court was required to identify

the State's purpose for introducing evidence about the active warrants, but that "no

evidence [was] offered pre-trial or during trial to indicate that Mr. Erickson was aware of

the warrants at the time the alleged events occurred." Br. of the Appellant at 41. Thus,

he argues the evidence could not have been relevant to establish his intent to flee if he

was not even aware of the warrants. However, as the State points out, it also introduced

evidence that Mr. Erickson had a police scanner in his vehicle that could have allowed

him to listen to the call to dispatch, in which Rylan referred to him as a "wanted

fugitive." RP at 213. This was circumstantial evidence the jury could have used to infer

20

that Mr. Erickson was aware of his warrant status. Thus, as the State argued, the purpose of the evidence was to establish Mr. Erickson's motive for fleeing.

Mr. Erickson next argues the third inquiry weighs against admission of the evidence because whether Mr. Erickson had active warrants was not relevant to prove an element of attempting to elude. Although we agree the existence of a warrant is not an element of the crime, the State was still required to prove Mr. Erickson willfully failed to bring his vehicle to a stop. RCW 46.61.024(1). The jury was instructed that a person acts willfully when he acts knowingly. The jury was further instructed that when "acting knowingly as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally as to that fact." CP at 22. Thus, evidence that Mr. Erickson intended to elude the police due to his outstanding warrants was relevant to prove he acted willfully.

As to the fourth inquiry, Mr. Erickson contends the prejudicial effect of the evidence outweighed its probative value. The court considered the probative value of the evidence and agreed with the State that the evidence was relevant to prove motive and intent to flee. It also considered the potential prejudice of the evidence and therefore prohibited testimony about the crimes underlying the warrants. The court properly weighed the probative value against the potential prejudicial effect and found the evidence was admissible.

Finally, Mr. Erickson argues the court erred when it did not provide the jury a limiting instruction. Though the State requested a limiting instruction, it does not appear one was given. However, defense counsel did not object to a limiting instruction not being given or otherwise request one. In any event, Mr. Erickson cannot demonstrate the lack of a limiting instruction prejudiced him. Indeed, as discussed above, the evidence of Mr. Erickson's outstanding warrants was not unduly prejudicial.

The court did not abuse its discretion in admitting evidence of Mr. Erickson's outstanding warrants when he attempted to elude law enforcement. Though it is prudent for a trial court to conduct the four-part inquiry for ER 404(b) evidence on the record, failure to do so here does not mandate reversal. Moreover, this court may uphold the admission of prior misconduct evidence on any proper ground. *Powell*, 126 Wn.2d at 259.

The court did not abuse its discretion when it admitted evidence of Mr. Erickson's warrant status when he attempted to elude law enforcement.

SENTENCING

Mr. Erickson argues his constitutional rights were violated at sentencing. Namely, Mr. Erickson contends the trial court violated his constitutional rights when the court, instead of a jury, determined prior convictions would be counted in his offender score. He further argues the court violated the Sentencing Reform Act of 1981 (SRA), chapter

22

9.94A RCW, when it did not determine the comparability of his out-of-state convictions before including them in his offender score. We disagree with both arguments.

*Right to a Jury Trial at Sentencing*

Both the Sixth Amendment and article I, sections 21 and 22 of the Washington Constitution guarantee a defendant the right to a jury trial. *State v. McKnight*, 25 Wn. App. 2d 142, 147, 522 P.3d 1013 (2023). In Washington, a defendant's offender score establishes the sentencing range a court may use in determining the sentence. RCW 9.94A.530. The sentencing court must include all current and prior convictions when calculating the offender score. RCW 9.94A.589(1)(a).

Pursuant to United States Supreme Court precedent, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Later, in *Blakely v. Washington*, the Court clarified *Apprendi* and held the statutory maximum means the maximum sentence a judge may impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. 296, 303, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (emphasis omitted). "In other words, in order to impose a sentence enhancement or aggravating factor that would increase the penalty faced by the defendant beyond the statutory maximum, any facts supporting such an

23

increase in penalty need to be proved to a jury beyond a reasonable doubt." *State v. Anderson*, 31 Wn. App. 2d 668, 678, 552 P.3d 803 (2024).

In interpreting *Apprendi* and *Blakely*, our Supreme Court explained that the exception to the jury requirement under *Apprendi* applies "*only* for prior convictions" and that where an enhancement requires findings of "new factual determinations and conclusions" beyond "'mere criminal history,'" those findings must be made by a jury. *State v. Hughes*, 154 Wn.2d 118, 141-42, 110 P.3d 192 (2005), *abrogated by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (quoting *State v. Butler*, 75 Wn. App. 47, 54, 876 P.2d 481 (1994)).

The United States Supreme Court has also noted that it could not "find . . . significant support for the proposition that the Constitution *forbids* a legislature to *authorize* a longer sentence for recidivism." *Almendarez-Torres v. United States*, 523 U.S. 224, 246, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). The United States Supreme Court has since declined to overrule *Almendarez-Torres*. *Apprendi*, 530 U.S. at 489-90; *Erlinger v. United States*, 602 U.S. 821, 836, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024).

Our Supreme Court interpreted the holding in *Almendarez-Torres* as a narrow "prior conviction exception" to the requirement that a jury find each element of a crime beyond a reasonable doubt. *State v. Jones*, 159 Wn.2d 231, 236, 149 P.3d 636 (2006); *see also State v. Brinkley*, 192 Wn. App. 456, 464, 369 P.3d 157 (2016). Further, the "prior conviction exception" includes not just the fact of the conviction itself, but also

24

the facts "'intimately related to the prior conviction.'" *Brinkley*, 192 Wn. App. at 464

(quoting *Jones*, 159 Wn.2d at 241).

Importantly, our Supreme Court has recognized that when a sentence is increased

by prior convictions, the fact of those prior convictions need not be found by a jury.

*State v. Wheeler*, 145 Wn.2d 116, 123-24, 34 P.3d 799 (2001). The court noted that

while the State is required to prove every element of an offense beyond a reasonable

doubt, "traditional factors considered by a judge in determining the appropriate sentence,

such as prior criminal history, are not elements of the crime." *Id.* at 120. Instead, "[a]ll

that is required by the constitution and the statute is a sentencing hearing where the trial

judge decides by a preponderance of the evidence whether the prior convictions

exist." *Id.* at 121.

Mr. Erickson primarily relies on a more recent United States Supreme Court case,

*Erlinger*, 602 U.S. 821. This court has twice decided that *Erlinger* "is limited to

resolving [the federal Armed Career Criminal Act]'s occasions inquiry and does not

overrule our state's well-established precedent in *Wheeler*." *State v. Anderson*, 31 Wn.

App. 2d 668, 681, 552 P.3d 803 (2024); *see also State v. Frieday*, 33 Wn. App. 2d 719,

744-45, 565 P.3d 139 (2025).

Thus, *Almendarez-Torres*, *Jones,* and *Wheeler* have not been overturned.

Consequently, Mr. Erickson's right to a jury trial was not violated when the court used

the fact of his prior convictions to sentence him at an elevated sentencing range without a jury trial.

*Out-of-State Comparability*

Mr. Erickson argues the court erred when it sentenced him with an offender score that included out-of-state convictions without requiring the State to prove the convictions were legally or factually comparable to Washington crimes. The State responds it did not need to prove the out-of-state convictions nor their comparability because Mr. Erickson stipulated his out-of-state criminal history consisted of comparable offenses.

When a defendant is sentenced, the sentence may vary depending on the offender score and the seriousness of the crime. *In re Pers. Restraint of Canha*, 189 Wn.2d 359, 367, 402 P.3d 266 (2017); RCW 9.94A.510. To properly calculate an offender score, the SRA requires the sentencing court to determine a defendant's criminal history based on their prior convictions and level of seriousness of the current offense. *State v. Wiley*, 124 Wn.2d 679, 682, 880 P.2d 983 (1994). The SRA also requires that prior out-of-state convictions be classified "according to the comparable offense definitions and sentences provided by Washington law." RCW 9.94A.525(3).

"To compare offenses, we use a two-part test." *Canha*, 189 Wn.2d at 367. First, the court analyzes whether the out-of-state offense is legally comparable to a Washington offense. *Id.* If the crimes are legally comparable, the inquiry ends, and the defendant's

offender score includes the out-of-state offense. *Id.* But, if the offenses are not legally comparable, we look to factual comparability. *Id.*

"Legal comparability means that the elements of a foreign conviction are substantially similar to the elements of a Washington crime." *State v. Farnsworth*, 133 Wn. App. 1, 17, 130 P.3d 389 (2006). "When the crimes' elements are not the same, the offenses are not legally comparable." *Canha*, 189 Wn.2d at 367. When the "foreign crime provides alternative elements, it must contain all the elements of its Washington counterpart to be considered comparable." *Farnsworth*, 133 Wn. App. at 17. But, if the elements of "the foreign law [are] broader than Washington's definition of a particular crime," the crimes are not legally comparable but may be factually comparable. *Id.*

On the other hand, "[f]actual comparability requires the sentencing court to determine whether the defendant's conduct, as evidenced by the indictment or information, or the records of the foreign conviction, would have violated the comparable Washington statute." *Id.* at 17-18 (citations omitted). However, "the underlying facts in the foreign record must be admitted, stipulated to, or proven beyond a reasonable doubt." *Id*.

Generally, under the SRA, the State bears the burden of proving the existence and comparability of out-of-state convictions. *State v. Ross*, 152 Wn.2d 220, 230, 95 P.3d 1225 (2004). Nevertheless, a defendant's affirmative acknowledgment that their prior

out-of-state convictions are properly included in their offender score satisfies SRA requirements and relieves the State of its burden to prove comparability. *Id.*

Here, the parties submitted a joint "Statement of Defendant's Criminal History." CP at 32. The statement included two Idaho convictions: reckless driving and forgery. The statement reads, "[t]he parties acknowledge and agree that the above information accurately reflects the Defendant's *comparable* felony history to the best of the parties' knowledge and belief" and specifically references RCW 9.94A.525. CP at 32 (emphasis added). Mr. Erickson signed the statement, and both parties agreed to the standard range at sentencing. Both convictions were ultimately included in his offender score.

Because Mr. Erickson stipulated to the statement of his criminal history, in which he explicitly agreed to the comparability of the offenses, the State did not need to prove the offenses were comparable to Washington crimes. Mr. Erickson's constitutional rights were not violated at sentencing.

$500 FINE

Mr. Erickson argues we should remand for the trial court to strike the $500 fine imposed under RCW 9A.20.021. The State responds that the issue is unpreserved but, if we review the issue, we should reject Mr. Erickson's argument. Although the error is unpreserved, we exercise our discretion and address the claimed error.

In *State v. Blazina*, our Supreme Court noted that an appellate court need not reach unpreserved claims of error related to legal financial obligations (LFO). 182 Wn.2d 827,

830, 344 P.3d 680 (2015).  However, the court explained that "an appellate court may use its discretion to reach unpreserved claims of error consistent with RAP 2.5." *Id.*  We exercise our discretion and address the issue.

Turning to the merits, Mr. Erickson contends the court improperly imposed the $500 fine because he was found indigent.  Here, the court imposed a $500 fine pursuant to RCW 9A.20.021.  RCW 9A.20.021 reads, in relevant part:

> (1) Felony. Unless a different maximum sentence for a classified felony is specifically established by a statute of this state, no person convicted of a classified felony shall be punished by confinement or fine exceeding the following:

> . . . .

> (c) For a class C felony, by confinement in a state correctional institution for five years, or by a fine in an amount fixed by the court of ten thousand dollars, or by both such confinement and fine.

When a person is convicted, the trial court may order the defendant to pay costs, often referred to as LFOs, as part of their sentence.  RCW 10.01.160(1).  However, by statute, the court is not authorized to order a defendant to pay LFOs if they are indigent.  RCW 10.01.160(3).  Thus, the sentencing court "has a statutory obligation to make an individualized inquiry into a defendant's current and future ability to pay before [it] imposes LFOs" under RCW 10.01.160(3).  *Blazina*, 182 Wn.2d at 830.

However, in *State v. Clark*, this court held the fine imposed pursuant to RCW 9A.20.021 is not a "cost" within the meaning of RCW 10.01.160(3).  191 Wn. App. 369, 376, 362 P.3d 309 (2015).  The court in *Clark* distinguished between the definitions of

costs and fines when reaching its holding that a sentencing court need not inquire about a defendant's ability to pay a fine. *Id.* at 375-76. Thus, the trial court is not required to consider a defendant's ability to pay when imposing a fine pursuant to RCW 9A.20.021 because it is not a cost under RCW 10.01.160(3). *Id.* The court did not err when it imposed the $500 fine.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Cooney, J.

WE CONCUR:

Staab, A.C.J.

Fearing, J.